**David G. FINCH, Plaintiff,**

v.

**HERCULES INCORPORATED, Defendant.**

**Civil Action No. 92–251 MMS.**

United States District Court,
D. Delaware.

Sept. 30, 1996.

1396

**1400**

Richard G. Elliott, Jr., and Helen M. Richards, of Richards, Layton & Finger, Wilmington, DE, for plaintiff.

Sheldon N. Sandler, and Teresa C. Fariss, of Young, Conaway, Stargatt & Taylor, Wilmington, DE, for defendant.

### *OPINION*

MURRAY M. SCHWARTZ, Senior District Judge.

## I. INTRODUCTION

Plaintiff David G. Finch ("Finch") has filed suit against his former employer, defendant Hercules, Incorporated ("Hercules"), alleging he was discriminated against based on his age in violation of the Age Discrimination in

Employment Act ("ADEA"), 29 U.S.C. §§ 621–34. Hercules terminated Finch at age 58 in February 1991, and after exhausting his administrative remedies, Finch brought this action on May 5, 1992. Docket Item ("D.I.") 1. After almost four years of indefatigable sparring over discovery, summary judgment, an aborted interlocutory appeal, and prodigious motions in limine, the parties at last were ready for trial. Commencing January 10, 1996, in a jury trial spanning nearly three weeks, Finch sought over $2 million in damages encompassing back pay, front pay, and stock losses. He also sought to double this figure by winning liquidated damages. The jury returned a verdict in Finch's favor on the issue of liability but awarded Finch only $200,000 in back pay. D.I. 295.

Before the Court are various post-trial motions: defendant's motion for judgment as a matter of law, D.I. 306, plaintiff's motion for a new trial on damages, D.I. 308, and plaintiff's motions for costs and attorneys' fees, D.I. 333, 357. To date, this litigation has provided the raison d'etre for no less than six opinions; the bulk of the parties' briefs and appendices on record thus far command an entire section in the Clerk of the Court's file room. Although the Court has persevered to convince counsel it would be in their respective clients' best interests to bring this case to closure, i.e., reach settlement, both parties have made it abundantly clear that an appeal is imminent regardless of the results of the decisions rendered today. If history is a reliable indicator, it is not unrealistic to expect this case to languish further in the federal court system.

For the reasons set forth in this opinion, the Court will deny plaintiff's motion for a new trial on damages and will deny defendant's motion for judgment as a matter of law. Because plaintiff has prevailed in this case, he will be granted attorneys' fees and costs, albeit reduced from the amount he has sought.

## II. FACTUAL BACKGROUND

At trial, the following evidence was adduced, as viewed in the light most favorable to Finch. Finch began his employment at Hercules in 1962 as a Systems Analyst. Tr. F–81. Over time, Finch enjoyed a series of promotions and transfers that culminated in the senior executive level position of General Auditor in charge of Hercules' Audit Department, a title he held for 11 years preceding his termination. Tr. F–83. As head of the Audit Department, Finch reported to work at Hercules' corporate headquarters in Wilmington, Delaware.

During the mid–1980s, Hercules, a major defense contractor, began downsizing and selling off its business units as a response to post Cold–War government defense reduction. Tr. C–21, E–88. Although Hercules divested itself of a number of businesses, it did not commensurately reduce the size of its central corporate staff in Wilmington, which comprised approximately 1600 personnel. Tr. A–113; Plaintiff's Exhibit ("PX") 1. Consequently, the company's overhead costs were proportionately greater than that of its peer corporations. Tr. A–114.

In 1988, Hercules appointed James Beach, its Vice President of Productivity and Management and Operating Services, to address this imbalance between the corporate headquarters' staff and the company's various divisions. Tr. A–112, 133–34. Beach hired Coopers & Lybrand, an outside auditing firm, to prepare a report, known as the Indirect Productivity Improvement ("IPI") study, and to recommend areas of possible elimination and consolidation. Tr. B–52–51. In late 1989, Beach hired consultant Thomas Litras with the goal of implementing the IPI recommendation of reducing Hercules' corporate workforce. Tr. B–53. Hercules terminated approximately 90 employees as part of an initial, albeit feeble, headquarters downsizing in January, 1990. Tr. A–136, Joint Trial Exhibit ("JX") 19, p. 7.

In September, 1990, Beach retained Litras again to design and execute a second, larger reduction in force ("RIF"). Tr. B–53, H–72. In that vein, Litras designated approximately 400 corporate positions that could be eliminated. Tr. B–103, H–78.

### A. Initiation of the RIF process

On December 31, 1990, at a special meeting of the Board of Directors' Executive

Committee, the proposed reduction in force was approved. JX 21. By January 9, 1991, Litras initiated training of Hercules executives, including Finch, on how to force rank employees with the goal of culling employees for the RIF. Tr. B–28, JX 27, JX 28. Litras' method of forced ranking required Hercules managers to rate their employees from best to worst with regard to a particular factor or factors. Hercules agreed to this forced ranking system because Litras had convinced management that Hercules' current performance evaluation mechanism was practically worthless. Tr. B–56–57, H–58–59. Employees were to be ranked based on comparison with other employees in positions of similar skill or status levels. Tr. B–30. The ranking of managers together with their subordinates was generally to be avoided. Tr. B–31. The final step in the RIF procedure involved Hercules' Compliance Committee. Tr. C–110. This committee functioned to monitor compliance with employment discrimination laws and assure uniformity in the RIF process. Tr. C–135, C–142.

### B. Finch's Role as General Auditor

As Audit Department head, it was incumbent on Finch to force rank his employees and assist in implementing elimination of positions from that department consistent with Litras' guidelines. Tr. F–92. After he attended the forced ranking indoctrination session, Finch's completed ranking sheets were due to Human Resources the following week. Tr. B–27. As far as Finch knew, the position of General Auditor was not targeted for elimination; the retention of Finch's position was consistent with Litras' report and recommendation. Tr. H–84, JX 35, p. 27. However, it was not within Finch's purview as department head to recommend elimination of his own job. Tr. H–74.

Under Hercules' management hierarchy, Finch reported directly to the Audit Committee of the Board of Directors. Tr. C–62, F–80. In addition, Finch reported administratively to Arden Engebretsen, Tr. F–9, Hercules' Vice Chairman of the Board of Directors and Chief Financial Officer ("CFO"). Tr. F–4, C–23–25. Finch and Engebretsen knew each other for over twenty years. Tr.

F–44. Aside from their mutual employment at Hercules, they were both active members of the same church congregation and saw one another at church functions. Tr. F–59. In his capacity as lay clergy, Finch had counseled Engebretsen's sons when they were teenagers; Finch and Engebretsen had also served together on the regional governing board of the church. Tr. F–138–39.

Also reporting to Engebretsen was George MacKenzie, Hercules' corporate Controller. Tr. G–46. At trial, MacKenzie testified that he had complained of Finch's participation in a car pool which prevented Finch's availability for conferences after five or six o'clock. Tr. F–68, G–63. Finch, however, testified that although he was in a car pool, it was only during the early 1980s, and that if there were meetings late in the day, he would stay late and have his wife pick him up. Tr. F–87. MacKenzie had also sharply criticized, in Engebretsen's presence, both the Audit Group and Finch as lacking in leadership of that group. Tr. G–70. In addition, MacKenzie also remarked to Engebretsen that Hercules, a Fortune 150 company, required a General Auditor who was a true professional, i.e., one credentialed as a Certified Public Accountant ("CPA"). Id., Tr. G–58. Finch was not so credentialed. Tr. F–134.

According to MacKenzie, Engebretsen tolerated little criticism of Finch's performance as General Auditor. MacKenzie recalled that in response to MacKenzie's critical comments about Finch, Engebretsen reacted by "ranting and raving." Id. MacKenzie recounted a later incident during which Engebretsen responded in like manner. Tr. G–71. After these episodes, fearing reprisal by Engebretsen, MacKenzie refrained from disparaging Finch in Engebretsen's presence. Tr. G–70.

MacKenzie was not the only executive who perceived Engebretsen as protective of Finch. Thomas McCarthy, Hercules' Vice President of Human Resources from 1985 to 1992, viewed Engebretsen as a greedy, self-serving individual who valued loyalty in his subordinates over competency. Tr. H–94–95. McCarthy thought little of Finch's capabilities and agreed with MacKenzie's assessment that Finch was underperforming. Tr. H–92.

Others complained to McCarthy about Finch's lack of performance. Tr. H–97.

Francis VanKirk of Coopers & Lybrand, the outside auditors, rated Finch's department at a level of "C minus" and Finch himself as rating a "D." Tr. J–38. The external auditors criticized Finch for lack of initiative, lack of cooperation, and lack of overall quality of performance. Tr. G–80, I–43, J–34–36. VanKirk testified that, more often than not, his firm had to redo or at least supplement the Audit Department's work product for it to meet professional quality standards. Tr. I–38.

Joan Spero, a recent Chairperson of Hercules' Audit Committee to which Finch directly reported, also did not have a high regard for Finch's abilities as General Auditor. Tr. K–51. She testified that in her opinion, Finch was not at the "cutting edge of what was going on in the audit area." Id. She felt that he lacked in leadership and technical expertise, and expressed concern that Finch was too deferential to CFO Engebretsen. She spoke of Finch as being "under [Engebretsen's] thumb." Tr. K–52.

Hercules presented testimony from others who derided Finch. James Anthony, one of Finch's subordinates, testified that Finch would sleep during the workday. Tr. J–9–10. Finch admitted that sometimes he would quite often read and then close his eyes to relax. Tr. F–145. Curiously, it was not until late in the administrative EEOC proceeding that anyone at Hercules informed Finch the audit department and his leadership were deficient. Tr. F–86.

Although there were these and other Hercules executives who were critical of Finch's performance as General Auditor, there were those who exuded nothing but praise on his behalf. Arthur Neilsen, patriarch of the Neilsen television ratings enterprise and audit committee board member of several other major corporations, was both a chairperson and member of the Hercules Audit Committee for most of the time period from 1977 through 1990. Tr. E–75–76, 82. Neilsen regarded Finch as

> well qualified, very professional, always presented his work on time. He presented his reports in the form clearly, you could

read and understand what he was talking about. And I thought he had very good judgment in selecting the points where we had to do the extra work. I think he followed up very effectively. And as far as I was concerned, he did an excellent job.

Tr. E–82–83. Neilsen testified that he never heard anyone criticize Finch, from either inside or outside Hercules. Tr. E–83. After becoming aware of Finch's termination, Neilsen offered to circulate Finch's resume and recommend Finch to any prospective employer. Tr. E–89.

Finch presented other executives who corroborated Neilsen's positive evaluation. William Hosker, Vice President and General Manager of Hercules Resins division, described Finch as changing the Audit Department from being adversarial to a department that was an ally of the business units. Tr. E–105. Hosker also recalled that Finch augmented the Audit Department's tradition of merely auditing financial issues with the institution of operational audits. Tr. E–106. These operational audits involved auditors "working with the working people at the plants, the people who knew who the processes were, and together, they came up with a list of suggestions, recommendations, that would improve the efficiency of the operation." Tr. E–106–07. The operational audit concept was further expanded into profit improvement and manufacturing efficiency programs that were eventually integrated into the operation of the business units themselves. Tr. E–107. Like Neilsen, Hosker viewed Finch as competent and beneficial to Hercules; he likewise had never heard any negative comments about Finch or his department. Tr. E–107–08.

Finally, Finch presented testimony by Engebretsen, who had been influential in Finch's promotion to General Auditor in 1980. Tr. F–8. Engebretsen was responsible for evaluating Finch and for any raises and bonus awards, Tr. F–21, F–50. Consistent with Neilsen's testimony, Engebretsen recalled that the Audit Committee was "complimentary regarding the way in which Mr. Finch discharged his duties." Tr. F–13–14. Finch invariably qualified for bonuses, stock

incentives, and above average raises. Tr. F–22. The record showed that Engebretsen documented written performance appraisals of Finch in 1980, JX 6; 1982, JX 7; and 1983, JX8. In 1982 and 1983, Engebretsen rated Finch's performance as clearly exceeding job requirements. JX 7, JX 8. There were no documented evaluations of Finch by Engebretsen or anyone else since 1983. Tr. F–50. However, there was evidence that Finch was considered as part of Hercules' succession planning process in which potential replacements for key executive positions were identified. For example, in 1987, Fred Buckner, Hercules' Chief Operating Officer, recommended Finch as someone with "growth potential" for a new European position. JX 12, Tr. F–27. In 1989, Finch was proposed as a candidate for a one or two level promotion. JX 14. In 1990, Alex Searl, Hercules' Treasurer, proposed Finch for a possible promotion to Assistant Treasurer. JX 15.

## C. Engebretsen's Departure From Hercules

In fall 1990, Hercules was engaged in the task of replacing its Chief Executive Officer ("CEO"), who had announced his intent to retire at year's end. Tr. B–94, C–19. Hercules' Board of Directors hired Thomas Gossage in approximately November, 1990, as the new CEO; Gossage promised he would make it a priority to spearhead a further, more significant reduction in force. Tr. B–101. CFO Engebretsen had applied for promotion to the CEO position but had been passed over in favor of Gossage. Tr. B–95. Engebretsen was not a serious candidate for promotion because of his responsibility for a failed Titan missile development contract in which Hercules lost over $300 million. Tr. K–54, 56. According to Neilsen, after all the accounting of the $300 million loss had been completed, the Audit Committee concluded that the loss was not the fault of the Audit Department. Tr. E–85. Rather, the blame lay in the overall management of the financial sector, with problems occurring at many levels of management. Tr. K–72. Consequently, Hercules' Board of Directors lost confidence in Engebretsen as CFO; indeed the departure of the outgoing CEO was influenced by the missile debacle. Tr. K–54–56, 60.

One of Gossage's first acts upon taking upon the mantle of CEO was to craft a severance package for Engebretsen. Tr. K–60. It was also Gossage's understanding that because Engebretsen had been panned as the successor CEO, Engebretsen elected to end his affiliation with the company. Tr. C–24. Engebretsen retired in early January, 1991. Tr. F–4. Gossage and the Board of Directors shared mutual concern about future change and upgrade of management of the financial function; changing the audit function, however, was not raised. Tr. K–57, 59.

On January 9, 1991, the same day that Litras initiated forced-ranking training of senior level executives, Gossage broke the news of the RIF in a memo to all Hercules employees. JX 25. In connection with his in-house announcement of the RIF, Gossage also granted a telephone interview with *The News Journal,* Wilmington's local daily newspaper. Tr. B–105. The next day, January 9, 1991, *The News Journal's* major front-page headline was entitled, "Hercules will cut 450 jobs." PX–1. The news story detailed Hercules' proposed RIF, outlining the corporation's plan to "offer a 'voluntary reduction in force' program until January 28 to employees over the age of 50 who have been with the company for at least 10 years." *Id.* If a sufficient number of employees did not voluntarily retire, they would be then subject to an involuntary RIF along with Hercules' employees under age 50. *Id.* The article went on to quote Gossage as stating, "The young people in the company want us to bring Hercules back to where it ought to be again," and "Older people will see friends impacted and will feel bad about it. But we'll get this behind us." *Id.* Gossage's statements caused quite a stir at Hercules; George Mac-Kenzie, then Hercules' Controller, characterized Gossage's remarks as "unfortunate" and testified that others felt likewise. Tr. H–15–16.

Hercules' internal publication, *Horizons,* also featured an article about the RIF and Gossage's statements to *The News Journal.* Tr. C–76. The general corporate atmo-

sphere was full of tension; employees were full of apprehension about who in their midst would suffer job loss. Tr. F–124.

Finch presented evidence of other remarks made by Gossage, albeit at a later date, in 1992. William Hosker testified that his manager, Doyle Miller, explained that Gossage was critical of the way Hosker's division had failed to address the "tired warriors" among its ranks. Tr. E–111–12. Hosker understood this phrase to denote someone aged in the mid–50s who was "blocking the movement of younger people into those positions which are necessary to get experience in order to contribute to the profitability of the corporation." *Id.*

### D. Reduction, Reconfiguration, and Finch

With Engebretsen's departure as CFO leaving a hole in Hercules' financial corporate hierarchy, all of the CFO's direct reports, including Finch, reported directly to CEO Gossage. Tr. B–145–46. Gossage requested input from the Treasurer and senior financial executives regarding the management structure of the financial organization until a new CFO could be found. Tr. C–86–87. Within one week of Gossage's remarks to *The News Journal*, MacKenzie proposed that the General Auditor, Finch, should report administratively on an interim basis to the Controller, *i.e.*, MacKenzie himself. *Id.*, JX 29. Formerly, both Finch and MacKenzie reported to the CFO. JX 3. On January 14, 1991, Gossage approved MacKenzie's proposal. Tr. C–87. Two days later, MacKenzie prepared an organizational chart that proposed eliminating the General Auditor position altogether. Tr. C–87, JX 30. MacKenzie's chart, proposed as an "interim" internal audit chart, listed Finch's direct reports as reporting to MacKenzie, with MacKenzie then reporting to the Audit Committee of the Board of Directors. JX 30.

MacKenzie discussed his proposal to eliminate the General Auditor position with Gossage, and they agreed that the idea should be put to the Chairperson of the Audit Committee, Spero. Tr. C–89. MacKenzie traveled to New York City and met with Spero, who was based there as Treasurer of the American Express Corporation. Tr. C–90, K–61. Spero readily agreed with MacKenzie's recommendation. *Id.*

Spero testified that at the next regular meeting of the Audit Committee, on January 29, 1991, the Audit Committee approved the restructuring of the Audit Department and the elimination of the position of General Auditor. Tr. K–97. Finch was not in attendance at the meeting. JX 32. The minutes of that meeting reflect only that "[t]he Chairman [Spero] led a discussion of the Internal Audit Department's performance and staffing." *Id.* Aside from Spero's testimony, there was no evidence of the Audit Committee's approval of elimination, interim or otherwise, of the General Auditor's position.

Elimination of the General Auditor's position was inconsistent with Litras' recommendations for downsizing the corporation. Tr. B–48. In addition, reconfiguring the General Auditor responsibilities into the hands of the corporate Controller was contrary to the findings of the Treadway Commission, an entity formed to study fraudulent financial reporting among publicly held companies, such as Hercules. Tr. G–110. The Treadway Commission has advised that a General Auditor, who is responsible for auditing the company's financial statements, should not report administratively to one who is responsible for preparing the company's financial statements. Tr. E–17. As Audit Committee member Neilsen explained:

> [T]he Controller's Department has to prepare the figures that go in the annual report. That is the whole objective, get those figures right. The function of the Auditor is to come around and see if that has been done correctly. Is there anything wrong with the Controller's work? If you have the Controller doing both things, it would be kind of like a baseball player calling balls and strikes on himself. It just wouldn't be a good idea.

Tr. E–92.

Because Finch now reported to MacKenzie, MacKenzie had the responsibility of force ranking Finch. Although the protocol recommended by Litras advocated against

ranking heterogeneous groups of employees, MacKenzie force ranked several department heads, including Finch, along with lesser management personnel. JX 31, p. 7. For example, along with Finch, MacKenzie ranked J.J. Woods, Director of Operational Reporting Department, with Wood's subordinate, J.P. Hunter, who was merely a manager in that department. Tr. G–103–04. The forced ranking also included D.K. Brown, head of the Corporate Reporting Division, and one of his subordinate managers, S.A. Murray. Tr. G–102–03. MacKenzie ranked Finch within a cohort of seven employees; Finch was ranked sixth out of the seven. MacKenzie terminated Finch, age 58, and the seventh-placed individual, who was age 52. JX 31.

On February 4, 1991, MacKenzie informed Finch that Finch's position was being eliminated and that he was no longer employed by Hercules. Tr. C–96, F–126. MacKenzie did not mention that the elimination of the position was only interim or temporary. *Id.* Although company policy required that a Final Personnel Report form be completed for all salaried exempt employees, there is no record of MacKenzie doing so. Tr. C–103–04, D–42. This report, if completed, would have included information on whether the terminated employee would be eligible for rehire. *Id.;* Tr. F–127–28.

When MacKenzie appeared before the Policy Compliance Committee ("PCC"), he represented that the position of General Auditor was to be eliminated. Tr. C–113. There was no evidence that he informed the PCC that the elimination was "temporary" or "interim." Tr. D–33, 62. The PCC Chairman, Robert Currie, understood the elimination would continue indefinitely; there was no discussion linking this elimination to the temporary non-existence of the CFO. Tr. D–78.

### E. Reinstatement of the General Auditor Position

At its annual shareholders' meeting in March, 1991, Hercules announced the hiring of Keith Elliott as its new Chief Financial Officer. Tr. E–7. One of Elliott's priorities as the new CFO was the reorganization of the financial sector, in terms of both individu-al employees and structural hierarchy. Tr. I–93. In June, 1991, Hercules shifted various key personnel within senior executive financial positions; for example, MacKenzie, formerly the Controller, became Treasurer. Tr. I–94. At this same time, Elliott decided to reinstitute the General Auditor position, and reinstate that position's reporting to the CFO. *Id.* From June, 1991 onward, the senior Audit Group employees reported administratively to the CFO pending the hiring of a new General Auditor. PX 31.

In the meantime, Finch filed a charge of age discrimination with the Equal Employment Opportunity Commission ("EEOC"). In an answer to an EEOC request to Hercules for information, on August 21, 1991, MacKenzie represented in a notarized statement that Finch's termination resulted from the elimination of the position of General Auditor. JX 37. MacKenzie did not relate that the elimination was merely interim. However, a representative from Hercules' Human Resources Department stated to the EEOC that Hercules had recently hired a new CFO who was analyzing Hercules' financial structure. JX 36 at 4. Hercules did not inform the EEOC that the General Auditor position had been resurrected. Hercules also represented that Finch would be considered as a candidate for senior level positions that may become available as a result of the restructuring. *Id.* Finch was not contacted by Hercules for any such position.

On October 7, 1991, Hercules interviewed Curtis Tomlin, a 38 year-old candidate for the General Auditor position. Tr. I–112. MacKenzie was a member of the team that interviewed Tomlin. Tr. I–111–12. After meeting with the Audit Committee and, *inter alia*, MacKenzie on December 4, 1991, Tomlin was officially introduced as Hercules' new General Auditor. *Id.* Right after that, on December 17, 1991, MacKenzie submitted a second, more detailed statement to the EEOC in the form of a sworn affidavit. JX 38. Although MacKenzie described in this second statement that the elimination of Finch's position was to be interim, he omitted mentioning that Hercules had not only reinstated the position but had also hired a 38 year-old replacement. In contrast to his

previous statement, MacKenzie also added poor performance as a reason why Finch was terminated. *Id.*

As examples of Finch's alleged poor performance, MacKenzie's affidavit catalogued Finch's failure to "undertake risk assessments" and to "provide an operational plan to guide his staff's activities for the fiscal year." JX 38, ¶ 10. At trial, however, MacKenzie conceded these statements were not accurate, that Finch's Audit Department did have an operational plan, and that Finch did undertake risk assessments. Tr. G–133–34.

MacKenzie also stated in his affidavit that, in his opinion, "the range of responsibilities of the General Auditor requires the training and expertise that is denoted by the CPA certification." JX 38, ¶ 10. However, Hercules recently offered the General Auditor position to Hans Holmberg, who is not credentialed with a CPA. Tr. E–20. Holmberg currently enjoys status as Vice President, Auditing Services, which oversees the range of Hercules audit functions worldwide. *Id.*

**F. Other Evidence of Hercules' Consideration of Age in the RIF**

Prior to the initiation of the actual RIF, Hercules conducted a demographic analysis of its corporate workforce to provide a snapshot of its workforce composition and data to be used for future personnel planning, recruiting, development, and training. Tr. H–52–53, JX 20. Age statistics of employees were present virtually in all documentation available to those implementing the RIF. Litras' analysis used age as a constant identifier against which other factors such as length of service, education, race, sex, etc. were compared. JX 20. Although Hercules' Director of Employee Relations, Robert Currie, testified that in the RIF process, Hercules was concerned not only about age discrimination, but race and gender discrimination as well, Tr. D–17, the forms used for the forced ranking of employees detailed both age and date of birth for the individual performing the ranking. The employee's gender, national origin, and race, however, were not listed. *Id.* Hercules admitted that

age was a criterion to be used in the RIF process, but only as a tie-breaker in the event that two employees tied on all other criteria. Tr. D–12. Theoretically, if there was a tie, then the younger employee would have been terminated; however, that situation apparently never arose. *Id.* Additionally, on January 4, 1991, Hercules Human Resources Department generated lists of Hercules employees aged 50 and older by age, salary, and name. JX 22. Currie admitted that it was likely that the lists based on age were produced to aid in the RIF planning, specifically in the recruiting of voluntary retirees. Tr. H–137.

Litras testified that statistically, if the RIF procedures had been correctly followed, there should have been a uniform, proportionate distribution of displacements among the various age groups. Tr. B–32. Finch produced evidence, however, that when the RIF was completed, the data showed otherwise. A larger, disproportionate amount of employees between the ages of 55–59 were terminated as contrasted to all other age groups; Finch, at age 58, fell into this category. JX 40.

Finch presented expert testimony analyzing statistics resulting from the RIF. Dr. Thomas Daymont testified that employees over 55 were almost twice as likely to be terminated. Tr. D–117–18. Daymont expressed surprise that an employee's age was listed on the forced ranking sheets because age purportedly was to play no part in the forced ranking process. Tr. D–108. He characterized age as receiving more attention in Hercules' demographic RIF analysis than any other factor. Tr.–104. Contrasting Hercules' RIF planning with those performed by other corporations, Daymont testified that "rarely if ever [had he] seen an analysis that had such a focus on age as the one in the case of Hercules." Tr. D–105.

In his analysis of the data, Daymont focused on exempt, *i.e.*, salaried employees such as Finch, Tr. D–109; the criteria for the forced ranking of exempt employees differed in some respects from those used in ranking hourly or non-exempt employees.[1] Tr. B–10.

---

1. In fact, Daymont testified that the RIF process operated differently for non-exempt workers and

The exempt employee data showed that the difference in the statistics was "large enough to be ruled out due to chance," and that "the probability level of getting this difference under the assumption of an age-neutral process was less than one percent." Tr. D–122. Based on the data, Daymont concluded that age was a factor in the decision-making process in the forced ranking of exempt employees. Tr. D–109.

Looking specifically at Hercules' financial sector, Daymont found that employees over 55 were five times as likely to be terminated than employees under 55. Tr. D–121. When Daymont focused on the ranking decisions made by MacKenzie, Daymont found that "workers 55 and above were substantially more likely to be terminated than younger workers." Tr. D–182. For MacKenzie terminations, nine out of eleven were over 40 years of age. Tr. H–19–20. In addition to terminating Finch, MacKenzie also terminated the following employees: J.A. Romano, age 51; J.L. Martin, age 31; W.J. Etherington, age 52; R.P. Macko, age 55; J.J. Krakowski, age 56; C.J. Smith, age 54; C.A. Matthews, age 44; R.V. Edwards, age 43; A.M. Sandy, age 22; and G.G. DeVito, age 55. *Id.;* JX 31. Daymont fount this disproportionate firing of older employees by MacKenzie consistent with the overall pattern of age discrimination in the RIF process of exempt employees. Tr. D–182–83. Notwithstanding this consistency, Daymont also conceded that the trend among the MacKenzie terminations could not be regarded as a statistically significant pattern because the statistical population of MacKenzie terminations was simply too small to be significant. Nevertheless, the evidence showed that when looking at the entirety of MacKenzie terminations, nine out of eleven were over 40 years of age. Tr. H–19–21.

Defendant's expert, Dr. Bernard Siskin, disagreed with Dr. Daymont's conclusions. Sisken found only "weak evidence that age play[ed] a role" in RIF decisionmaking. Tr. I–155. He agreed, however, that there was a statistically significant "quirk" or "fluke" in that data that showed the Hercules exempt employees at ages 55–56 as being at greater

that age was not a factor in the RIF decisions

risk at being terminated for reasons possibly not related to mere chance. Tr. I–146, 156, 186. He also pinpointed termination decisions arising from the Treasurer's and Information Resource departments as possibly relating to this statistical anomaly. Tr. I–186.

## III. DISCUSSION

### A. Defendant's Judgment as a Matter of Law

#### 1. Legal Standard

The standard for granting a judgment as a matter of law is set forth in Fed.R.Civ.Proc. 50(a), which provides in relevant part as follows:

> If during a trial by jury a party has been fully heard with respect to an issue and there is no legally sufficient evidentiary basis for a reasonable jury to have found for that party with respect to that issue, the court may grant a motion for judgment as a matter of law against that party on any claim, counterclaim, cross-claim, or third-party claim that cannot under the controlling law be maintained without a favorable finding on that issue.

A motion for a judgment as a matter of law ("JMOL") encompasses what was previously referred to as a "directed verdict" and a "judgment notwithstanding the verdict," depending on whether the motion is brought before or after jury deliberations. The standard applied to a JMOL is a stringent one, contemplating "the court's duty to assure enforcement of the controlling law and [to not intrude] on any responsibility for factual determinations conferred on the jury." Fed. R.Civ.P. 50, Advisory Committee Notes, 1991 amendment.

As the rule requires, Hercules sought a JMOL before submission of the case to the jury, Fed.R.Civ.P. 50(b), and now renews its motion post-trial. Although entitled to do so under Rule 50(b), Hercules chose not to move for a new trial. The Court is charged with reviewing "the evidence, together with all reasonable inferences therefrom, in the light most favorable to the verdict winner." *Rotondo v. Keene Corp.*, 956

involving non-exempt employees. Tr. D–109.

F.2d 436, 438 (3d Cir.1992). If the evidence and justifiable inferences most favorable to Finch afford any rational basis for the verdict, then judgment as a matter of law is inappropriate. *Delli Santi v. CNA Ins. Cos.,* 88 F.3d 192, 200 (3d Cir.1996) (quoting *Anastasio,* 838 F.2d at 705) (internal citations omitted). The Court may not weigh the evidence, pass on the credibility of witnesses, or replace its version of the facts for that of the jury. *Blair v. Manhattan Life Ins. Co.,* 692 F.2d 296, 300 (3d Cir.1982). The Court may, however, enter JMOL if upon review of the record, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, it can be said as a matter of law that there is insufficient evidence from which a jury reasonably could find liability. *Coleman v. Kaye,* 87 F.3d 1491, 1497 (3d Cir. 1996).

At trial, Finch sought submission of his case to the jury under the "mixed-motive" legal theory enunciated in *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). The record, however, did not support a conclusion that both legitimate and illegitimate factors played a role in Hercules' decision. Further, Finch had not presented evidence of discrimination sufficiently direct "to shift the burden of proof to the employer on the issue of whether the same decision would have been made in the absence of the discriminatory animus." *Miller v. CIGNA,* 47 F.3d 586, 597 n. 9 (3d Cir.1995) (in banc). Consequently, the jury was instructed to consider the evidence under the now familiar "pretext" and burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green,*[2] 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207

(1981). Under these principles, Finch bore the burden of proving that age was a determinative factor in his employer's challenged employment decision. *Miller,* 47 F.3d 586 at 596; *Chipollini v. Spencer Gifts, Inc.,* 814 F.2d 893, 897 (3d Cir.) (*in banc*), *cert. dismissed,* 483 U.S. 1052, 108 S.Ct. 26, 97 L.Ed.2d 815 (1987).

For purposes of its motion for JMOL, Hercules wisely assumes *arguendo* that Finch met his initial burden of establishing the requisite prima facie case.[3] D.I. 343 at 16. However, once Hercules produced rebuttal evidence at trial of some legitimate, nondiscriminatory reason for its termination of Finch, Finch needed to prove to the jury that "the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093. To show pretext, Finch could not simply show the Hercules' decision was merely wrong or mistaken, or that Hercules was not "wise, shrewd, prudent, or competent." *Brewer v. Quaker State Oil Ref. Corp.,* 72 F.3d 326, 331 (3d Cir.1995). Rather, to show pretext, Finch needed to demonstrate such "weaknesses, implausibilities, inconsistencies, incoherences, or contradictions" in Hercules' "proffered legitimate reasons for its action that a reasonable fact finder could rationally find them unworthy of credence and hence infer that the employer did not act for [the asserted] nondiscriminatory reasons." *Id.*

Thus, assuming Hercules marshaled rebuttal evidence at trial, Finch still had the ultimate burden to show that age "played a role in the decisionmaking process and that it had a determinative influence on the outcome of that process." *Miller,* 47 F.3d at 597; *see also Gomez v. Allegheny Health Services, Inc.,* 71 F.3d 1079, 1084 (3d Cir.1995) ("once the defense has produced rebuttal evidence,

**2.** Although these seminal employment discrimination cases involved a different statute, *i.e.,* Title VII, the same analysis is invariably applied in ADEA jurisprudence. *Trans World Airlines v. Thurston,* 469 U.S. 111, 121, 105 S.Ct. 613, 621–22, 83 L.Ed.2d 523 (1985); *Waldron v. SL Indus., Inc.,* 56 F.3d 491, 494 n. 4 (3d Cir.1995).

**3.** To prove his prima facie case, Finch needed to show that 1) he was over age 40, the protected age group at the time of Hercules' challenged

employment action, 2) he was qualified for the position at issue, 3) despite these qualifications, he was terminated, and 4) he was replaced by a person sufficiently younger so as to permit an inference of age discrimination. *See Fuentes v. Perskie,* 32 F.3d 759, 763 (3d Cir.1994); *Armbruster v. Unisys,* 32 F.3d 768, 777 (3d Cir.1994) (citing *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093–94; *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824).

the question becomes whether the plaintiff has proved discrimination"). ·

### 2. Hercules' Arguments and the Evidence

#### a) Evidence of Pretext

■ Hercules sets forth a number of arguments as to why it thinks no reasonable jury could conclude that Finch's "age had anything with the decision to terminate his employment." D.I. 343 at 16. First, Hercules contends that Finch did not present evidence· that Hercules' stated reason for terminating Finch was unworthy of credence, and· that age was the real reason for his termination. Contrary to Hercules' assertions, however, the trial record does contain sufficient evidence that a reasonable fact finder could find Hercules' proffered reasons for terminating Finch were unworthy of credence. First, both sides adduced evidence supporting their diametrically opposing versions of Finch's performance as General Auditor. Although he presented a lesser quantity of Hercules-affiliated witnesses that spoke favorably of his performance, Finch produced a star witness on his behalf, Arthur Neilsen, who can be described as an American corporate icon. According to Neilsen, Finch's performance as General Auditor was unblemished. Other supporting testimony and documentary evidence showed that documentation of Finch's performance at Hercules was unblemished as well. Finch demonstrated that his· performance rated his being suggested for promotion on several occasions. After viewing all of the evidence, the jury was free to weigh demeanor of the witnesses, as well as the impact, if any, of the witnesses' current affiliation with the defendant on their credibility; the record contains sufficient evidence allowing a reasonable factfinder to conclude that the proffered reason of poor performance was pretextual.

After rehearsing in its brief evidence presented at trial of Finch's poor performance, Hercules additionally concluded that at best, Finch showed that various decisionmakers at Hercules disagreed about the quality of Finch's performance. Hercules then argues that the evidence was "overwhelming" that Hercules honestly believed changes were necessary in the company's financial sector, and, in furtherance of that goal, Finch was terminated based on his performance, not his age.

Finch presented evidence sufficient to allow a reasonable juror to call into question the credibility and honesty of the decisionmaker responsible for Finch's termination, MacKenzie. Tellingly, no one at Hercules bothered ·to tell Finch during his eleven years as General Auditor that his performance was sub par until after he was terminated and filed an EEOC complaint and then only after the Hercules' original advanced reason (elimination of the General Auditor position) could no longer be used as a satisfactory reason for the termination. First, the record shows that Litras, .who masterminded the RIF, did not recommend the position of General Auditor be eliminated; that elimination was singularly ascribed to MacKenzie. There was evidence sufficient to support an inference that MacKenzie also deviated from Litras' protocol regarding the grouping of like employees together when he ranked Finch along with other employees not at his management level. In addition, depending on his audience, MacKenzie varied the presentation of his plan to eliminate Finch's General Auditor position. When he presented his proposal to CEO Gossage and Audit Committee Chairperson Spero, MacKenzie· outlined the plan as "interim." JX 30; Tr. C–89. When he described the elimination of Finch's position to the Policy Compliance Committee, however, he did not disclose that the elimination was temporary or interim; the PCC treated Finch's termination as a position elimination. Tr. D–62. When MacKenzie broke the news to Finch that he was being terminated, he told Finch that he was being fired because his position was being eliminated. Tr. F–126. MacKenzie also did not mention that the elimination of the position was temporary, or that any consideration of Finch's performance factored into the termination decision. *Id.;* Tr. C–97. Moreover, MacKenzie's discrediting Finch's lack of CPA certification as additional justification for termination could be considered incredible in light of MacKenzie's later participation in the hiring of a successor General Auditor that also had not earned a

CPA. Last, but by no means least, in a sworn affidavit, MacKenzie represented to the EEOC that the position of General Auditor had been eliminated even though Mac-Kenzie had previously authored internal Hercules documentation showing that it was only an *interim* elimination. JX 37. This omission was all the more egregious considering MacKenzie's active role in the hiring of the new General Auditor, Tomlin. Based on the exhibits admitted into evidence, MacKenzie never told the EEOC that Finch's position had been resurrected; Hercules did not volunteer to the EEOC information the a new General Auditor had been hired until the EEOC specifically asked about Tomlin in May, 1992. JX 39.

The Court again emphasizes that for purposes of the JMOL motion, the evidence must be viewed in the light most favorable to Finch. The weight assigned to this evidence by the jury will not be second guessed; nor will the Court interpose its own belief as to what the evidence showed if it were different from that of the jury's. Accordingly, the Court finds the evidence presented at trial was sufficient to allow the jury reasonably to find enough inconsistencies, implausibilities, and incoherences supporting an inference that evidence emanating from MacKenzie, the decisionmaker, was unworthy of credence.

### b) Evidence of Age Discrimination

■ To survive Hercules' motion for JMOL, Finch must have also coupled his presentation of pretext evidence with other evidence of discrimination so as to be sufficient to justify a reasonably drawn inference that he was terminated because of his age. Hercules characterizes Finch's evidence of Hercules' anti-age animus as a "mishmash of unrelated speculation." D.I. 343 at 21. A review of the record, however, shows that Finch adequately wove the evidence into a web of facts from which a reasonable juror could draw inferences in his favor.

At trial, Finch presented an overall picture of a corporation that had a history of considering age in its employment decisionmaking. For example, in succession planning documents pre-dating the 1991 RIF in Hercules' financial sector, age was listed as a promi-

nent component, usually delineated next to an employee's name. JX 10, 15, 16. Age was also used by Litras as a constant identifier in his pre-RIF demographic analysis. JX 9. Finch presented expert testimony through Dr. Daymont painting this particular practice as suspect. Age also appeared on a monthly personnel report disseminated to Hercules department heads. PX 5. Immediately prior to the RIF, Human Resources generated a list of employees, sorted by age, who were age 50 and over and who had more than 10 years of service with the company. JX 22. Although Hercules proffered a facially legitimate reason for the use of this report, the jury was free to draw its own inferences from these types of evidence considered separately and as a whole. Finally, both age and date of birth were highlighted on the force ranking sheets themselves. In short, a jury could reasonably conclude that age was frequently considered in employment decisionmaking at Hercules.

Layered atop these circumstantial considerations were the comments of CEO Gossage. During his interview with *The News Journal*, he contrasted the effect of the RIF on younger and older workers. Gossage accepted responsibility for the newspaper's quote, acknowledging that if it was not a precise quote, it captured the spirit of what he said. Tr. B–109. Gossage also explained that his remarks merely indicated that older Hercules employees who enjoyed a greater length of service would miss their friends who, being over age 50, would decide to take advantage of the voluntary retirement package that preceded the involuntary RIF. Tr. B–111. He also added that the statement meant that the younger employees felt that Hercules should "get on with it and try to bring the company back to the level of performance it had." *Id.*

Finch testified that as an older employee, he was offended by Gossage's remarks and that he concluded that Gossage was sending a message that the older people were no longer wanted. Tr. F–116. Finch also testified that Gossage was called upon to explain and confirm his remarks to *The News Journal* as chronicled by the in-house publication, *Horizons,* Tr. F–119–21; the jurors were

free to infer from this that other older employees were similarly fearful to justify further probing of the remarks. MacKenzie also remarked that he and others thought Gossage's statements were unfortunate, although the jurors were left to draw their own inference as to why MacKenzie regarded Gossage's choice of words as unfortunate.

From this evidence, a reasonable juror could draw an inference that Gossage believed that younger people, as opposed to older people, were the ones who cared more and were better equipped to revive Hercules' corporate health. *Accord, Siegel v. Alpha Wire Corp.*, 894 F.2d 50, 55 (3d Cir.1990), (use by the CEO of the phrase "old dogs won't hunt", together with other evidence held to be sufficient to allow a trier of fact to find a bias against older employees), *cert. denied*, 496 U.S. 906, 110 S.Ct. 2588, 110 L.Ed.2d 269 (1990).

Finch also presented evidence that Gossage, as incoming CEO, sought to immerse himself in his new role and emerge as a strong leader. While being considered for this post, Gossage made it clear that one of his "platforms" would involve the streamlining and aggressive downsizing of Hercules corporate workforce. Because of the enormity of the RIF, Gossage's statement to *The News Journal* would have been noteworthy in itself. The jury, however, could also have reasonably drawn an additional inference that in this first public proclamation as CEO, Gossage was also setting the tone of his management philosophy and style. Gossage agreed that "for the most part," employees would tend to listen to what their CEO would say. Tr. B–105. Similarly, the Third Circuit Court of Appeals has observed that "[w]hen a major company executive speaks, 'everybody listens' in the corporate hierarchy, and when an executive's comments prove to be disadvantageous to a company's subsequent litigation posture, it can not compartmentalize this executive as if he had nothing more to do with company policy than the janitor or watchman." *Lockhart v. Westinghouse Credit Corp.*, 879 F.2d 43, 54 (3d Cir.1989).

The record also shows that MacKenzie sought to curry favor with Gossage, to whom he directly reported during the RIF due to there being no CFO. MacKenzie has been aggressively promoted during Gossage's tenure, over a relatively short amount of time. MacKenzie wasted no time in answering Gossage's request for input as to how to restructure the financial sector; he was also charged with force ranking his managerial subordinates. MacKenzie's terminations exhibit a marked tendency to disfavor older employees; nine out of eleven of his terminated employees were over age 40, the threshold age for triggering of the ADEA. Following the RIF, Gossage set and approved a $100,000 bonus bestowed on MacKenzie for his efforts; previously, MacKenzie's bonuses were in the range of $40,000. Tr. H–13–14. In addition, Gossage has promoted MacKenzie up Hercules' corporate rungs to the position of CFO. Tr. C–56. Again, the jury was free to consider this evidence, which was sufficient in indicating a possible nexus between Gossage's statement, MacKenzie's aspirations for promotion, and the resulting terminations at MacKenzie's hands. Based on this evidence, the jury could have reasonably inferred that MacKenzie was influenced by his new boss's remarks.

In addition, Finch presented evidence that other executives may have been similarly influenced by Gossage's remarks. According to Daymont, the likelihood of being a victim of Hercules' RIF increased steadily with age from 10.9% for under age 40, 15.2% for those in their 40s, and 20.4% for those age 50 and older. Tr. D–124. Daymont also presented evidence that among 55 to 59 year old exempt employees, such as Finch, over 25% were terminated. Daymont testified that in his expert opinion, the statistical data provided strong support that age discrimination permeated the RIF decisionmaking among exempt Hercules employees. Defendant's expert, while ably reshuffling the RIF statistics to show a competing interpretation of the data favorable to Hercules, conceded that there was a quirk in the data involving a disproportionate termination of employees around the age of 55 or 56. He admitted that statistically, this could not be due to chance.

Finally, the record also contained additional evidence of a second incident where Gossage may have again demonstrated an anti-age animus consistent with the remarks outlined above. According to another former Hercules employee, Hosker, his immediate superior informed him at a staff meeting that Gossage had expressed dissatisfaction with the handling of "tired warriors" in Hosker's division. Hosker understood his supervisor to explain a "tired warrior" as one who was around age 50 and who was blocking the advancement of younger employees. Although Gossage denied ever using the phrase "tired warriors," it was for the jury to weigh and resolve the conflicting testimony and draw inferences therefrom. Although remote in time, the "tired warriors" statement could be viewed as evidence sufficient to support an inference of ongoing corporate anti-age bias. *See Abrams*, 50 F.3d at 1214 (citing *Lockhart*, 879 F.2d at 54; *Roebuck v. Drexel Univ.*, 852 F.2d 715, 733 (3d Cir. 1988)).

Taken as a whole, in the light most favorable to Finch, the Court finds that there was sufficient evidence of anti-age bias permeating the Hercules corporate culture to allow the jury to find that the decisionmaker in this case, MacKenzie, discriminated against Finch when he terminated him in 1991.

In sum, for purposes of the JMOL motion, the Court will not make an independent determination regarding which party, as a factual matter, has been blessed with a preponderance of the evidence. Rather, at this post-trial stage, Hercules needed to demonstrate that there was no rational basis underlying the jury's verdict and that the record was devoid of sufficient evidence from which the jury could find liability. This Hercules has not done; the above analysis of the trial record demonstrates the presence of ample evidence sufficient to support the verdict of

liability as reasonable. Defendant's motion for JMOL will accordingly be denied.

## B. Plaintiff's Motion for New Trial on Damages

Finch has also expressed dissatisfaction with the verdict by filing a motion for a new trial on damages. Finch urges that the Court erred in: (1) allowing defendant's expert to present statistical evidence regarding voluntary retirement of persons in the workforce in general and at Hercules; (2) instructing the jury that it was plaintiff's burden to prove the extent of his damages and the date on which he would have retired from Hercules; and (3) instructing the jury on mitigation of damages rather than ruling as a matter of law that plaintiff made a reasonable effort to mitigate.

### 1. Legal Standard—Grant of New Trial

"The authority to grant a new trial resides in the exercise of sound discretion by the trial court, and will only be disturbed if the court abused that discretion." *Wagner v. Fair Acres Geriatric Ctr.*, 49 F.3d 1002, 1017 (3d Cir.1995) (quoting *Allied Chemical Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36, 101 S.Ct. 188, 190–91, 66 L.Ed.2d 193 (1980)). The Federal Rules of Civil Procedure vest a trial court with broad discretion in considering a motion for a new trial when the proffered ground is legal error. *See* Fed.R.Civ.P. 59(a).[4] Although Rule 59 does not specify grounds upon which the Court may grant a new trial, significant errors of law prejudicial to the moving party involving evidence or jury instructions have been properly found as bases for a new trial. *See Persinger v. Norfolk & Western Ry.*, 920 F.2d 1185, 1189 (4th Cir.1990) (prejudicial expert testimony justified grant of new trial); *Waldorf v. Shuta*, 896 F.2d 723, 730 (3d Cir.1990) (erroneous jury instruction serve as basis for new trial).

---

**4.** This rule provides:

(a) Grounds. A new trial may be granted to all or any of the parties and on all or part of the issues (1) in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States; and (2) in an action tried without a jury, for any of the reasons for which rehear-

ings have heretofore been granted in suits in equity in the courts of the United States. On a motion for a new trial in an action tried without a jury, the court may open the judgment if one has been entered, take additional testimony, amend findings of fact and conclusions of law or make new findings and conclusions, and direct the entry of a new judgment.
Fed.R.Civ.P. 59(a).

In evaluating a motion for a new trial on the basis of trial error, the Court's inquiry is twofold: (1) whether an error was in fact committed, and (2) whether that error was so prejudicial that denial of a new trial would be "inconsistent with substantial justice." *Bhaya v. Westinghouse Elec. Corp.*, 709 F.Supp. 600, 601 (E.D.Pa.1989) (quoting Fed.R.Civ.P. 61), *aff'd*, 922 F.2d 184 (3d Cir.1990), *cert. denied*, 501 U.S. 1217, 111 S.Ct. 2827, 115 L.Ed.2d 997 (1991).

■ Finch seeks a new trial only on the issue of damages. "[I]f it clearly appears that the issue to be retried is so distinct and separable from the other that a trial of it alone may be had without prejudice," an issue may be isolated for a new trial. *Spence v. Board of Educ. of Christina Sch. Dist.*, 806 F.2d 1198, 1201–02 (3d Cir.1986) (quoting *Gasoline Prod. Co. v. Champlin Ref. Co.*, 283 U.S. 494, 500, 51 S.Ct. 513, 515, 75 L.Ed. 1188 (1931)). Because the nature or extent of the employer's wrongdoing do not enter into the calculation of front and back pay, employment discrimination cases often lend themselves to bifurcation of liability and damages. *See, e.g., Savarese v. Agriss*, 883 F.2d 1194 (3d Cir.1989) (affirming liability but vacating and remanding the issue of damages); *Jordan v. Atchison, Topeka Santa Fe Ry. Co.*, 934 F.2d 225, 229 (9th Cir. 1991) (grant of new trial on damages stemmed from erroneous jury instruction on loss of future earnings). However, given the manner in which the evidence was presented the Court views somewhat skeptically the notion of separability of liability and damages in this case. The Court's assessment corresponds to the positions of the parties prior to trial; both parties steadfastly opposed bifurcation.

### 2. Expert Testimony

■ Finch contends the Court committed legal error by permitting one of Hercules' expert witnesses to present statistical evidence regarding retirement age demographics. Hercules presented testimony by Dr. Jerome Staller, a forensic economist with a Ph.D. in economics and statistics, who was qualified as an expert on economic damages. Tr. J–159. In his testimony, Staller maintained that to make an informed calculation of Finch's damages in terms of lost wages, the pivotal question of *when* Finch would have retired needed to be addressed first. Although Staller was aware that Finch testified that he had not intended to retire until age 65 or 70, Staller estimated that, based on retirement statistics, it was likely that Finch would have retired somewhere between the ages of 60 and 62. Tr. J–161. In coming to this conclusion, Staller looked at both internal data related to retirement patterns at Hercules as well as external data regarding age of voluntary retirement in this country in general. *Id.*

According to Staller, one study showed that up to 77 percent of men retire from their regular career jobs nationwide before age 65. Tr. at J–164. Another study, conducted by a Dr. Parnes, showed that 70–73% of people retire before age 65. *Id.* Staller was quick to point out that Parnes was a colleague of one of plaintiff's expert trial witnesses on damages, Dr. Paul Andrisani. Tr. J–165. In addition, Nestle, another colleague of Parnes, conducted a survey of people at age 59 and asked the participants when they expected to retire. *Id.* Approximately 73% replied that they would not retire until after age 65; however, 75% actually retired before turning 65. *Id.* From these data, Staller concluded that one's actual date of retirement usually arrives much sooner than one anticipates. Staller also showcased internal Hercules data demonstrating that from 1989 to 1992, the average voluntary retirement age at Hercules was 60. Tr. J–166. In 1993, the average age was 58. *Id.* Seventy-five percent of Hercules workers retired by age 62. *Id.*

After testifying about retirement trends, Staller described the economics of the decision to voluntarily retire at a given age, using Finch as an example. If Finch retired at age 62, for example, he would have received an annual retirement annuity of $54,000. Tr. J–168. In addition, Finch would have access to his 401K retirement plan money that was in excess of $185,000. *Id.* Without touching the principal 401K sum, assuming a rate of return of six and one-half percent, Finch would earn $12,000 annually in interest. Finch would also be eligible for Social Securi-

ty benefits worth annually approximately $12,000. *Id.* Finally, Staller calculated Finch as earning an annualized amount of $6,000 from the sale of stock that was not accessible to Finch until he retired. *Id.* Taken together, these sources of income would yield a total of $84,000 in annual income.

Staller contrasted this figure with his projection of Finch's annual salary at age 63 of $120,000, a figure $36,000 above the passive income figure given above. *Id.* However, had Finch continued working, Staller calculated he would be in a 40 percent total tax bracket, and would net only $21,000 from the extra $36,000. *Id.* Stated differently, Staller testified that Finch could "take his retirement, get $84,000 in [cash] flow, or he stays and works and he gets 120 [thousand] but nets in effect an additional maybe $20,000." *Id.* Staller posited that by the time many people reach age 62, they deem it not worth their while for the incremental increase in income to stay employed.

 Finch argues that Staller's testimony on the subject of retirement age should have been excluded under Rule 702 of the Federal Rules of Evidence. Rule 702 allows for the introduction of expert testimony that "will assist the trier of fact to understand the evidence or to determine a fact in issue." [5] This rule establishes a "liberal policy of admitting expert testimony which will 'probably aid' the trier of fact." *Knight v. Otis Elevator Co.*, 596 F.2d 84, 87 (3d Cir.1979) (quoting *Universal Athletic Sales Co. v. American Gym, Recreational & Athletic Equip. Co.*, 546 F.2d 530, 537 (3d Cir.1976), *cert. denied*, 430 U.S. 984, 97 S.Ct. 1681, 52 L.Ed.2d 378 (1977)). Consequently, "doubts about whether an expert's testimony will be useful should generally be resolved in favor of admissibility." *In re Japanese Elec. Prods. Antitrust Litig.*, 723 F.2d 238, 278 (3d Cir.1983), *rev'd on other grounds*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Finch's objections at trial to Staller's testimony were the following: (1) such testimony would confuse the jury, Tr. J–71; (2) the statistics should not be admitted because there is no record evidence that Finch intended to retire earlier than age 65 or 70, Tr. J–149; (3) an expert should not be able to testify based on statistics that someone would retire, Tr. J–71; (4) Staller was qualified only to testify about damages, not as an expert in retirement trends, Tr. J–161.

 Courts have traditionally allowed litigants to present statistical evidence in employment discrimination actions. *See e.g., Abrams v. Lightolier, Inc.*, 50 F.3d 1204, 1217 (3d Cir.1995) (collecting cases on the use of statistics in proving discriminatory animus); *Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1188 (2d Cir.) (statistics of work life estimates in calculating damages admissible), *cert. denied*, 506 U.S. 826, 113 S.Ct. 82, 121 L.Ed.2d 46 (1992); *EEOC v. Mike Smith Pontiac GMC Inc.*, 896 F.2d 524, 530–531 (11th Cir.1990) (use of statistical average of work life expectancy used in calculating back pay damages). Finch now challenges the admission of Staller's statistical evidence on the ground that his statistics were based on unreliable raw data. D.I. 340 at 22. In general, scientific evidence, such as statistics, is regarded as reliable if an expert has "good grounds" for his testimony, *i.e.*, his opinions are "based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation.' " *United States v. Velasquez*, 64 F.3d 844, 849 (3d Cir.1995) (quoting *In re Paoli R.R. Yard, PCB Litig.*, 35 F.3d 717, 742 (3d Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1253, 131 L.Ed.2d 134 (1995)). While it is true that the Court acts as the "gatekeeper" concerning the qualification of an expert, and the admissibility of evidence, *Velasquez*, 64 F.3d at 849, the reliability of the methodology of Staller's statistics was not a proffered basis of objection at trial. Accordingly, the Court will not consider this new ground of objection post-trial.

---

**5.** Rule 702 in its entirety provides:
 If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by

knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
 Fed.R.Evid. 702.

■ Finch also reiterates his assertion that Staller's statistical evidence regarding retirement patterns confused the jury. However, as the factual question of when Finch would have retired was within the province of the jury, *Anastasio*, 838 F.2d at 709, the jury was entitled to both Finch's evidence of his intentions as well as countervailing statistical evidence presented by Hercules designed to undermine Finch's testimony. In elaborating on his theme of confusion, Finch now contends that while Staller disclosed what he purported would be the extent of his proposed testimony during discovery, Staller presented additional evidence for the first time at trial. Finch complains that his expert, Dr. Andrisani, was not present for Staller's testimony, and that there was inadequate time to prepare effective rebuttal to the "new" evidence.

The Court, however, is not responsible for the absence of Finch's expert during the presentation of Hercules' corresponding expert. Moreover, after combing through the trial record, there is no record of Finch objecting, on the grounds of confusion or otherwise, to the allegedly new and previously unknown material presented by Staller.[6] Instead, Finch chose to cross-examine Staller on evidence that had not been anticipated to come up at trial. Again, Finch's failure to object must be deemed as a waiver of his right to assert this new argument post-trial.

Finch next argues that Staller failed to establish any connection between his generalized data on retirement statistics and Finch as an individual, and that it was thus error to admit the statistics. D.I. 340 at 23. Finch is correct in arguing that admissibility of evidence depends on "the proffered connection between the scientific research or test result to be presented and particular disputed issues in the case." *See Paoli*, 35 F.3d at 743. The issue in dispute was, in the absence of his being terminated, at what age would Finch have retired from Hercules. The only evidence presented by Finch of when he would have retired from Hercules was Finch's own testimony. His work and life expectancies were both inherently germane to the calculation of his damages, and, absent a crystal ball, statistical analyses served as the next best barometer of the reality of Finch's stated intentions. *See Anastasio*, 838 F.2d at 709 (an age discrimination plaintiff's work and life expectancy are pertinent factors in calculating damages); *Tyler*, 958 F.2d at 1188 (expert's presentation of work life expectancy statistics relevant to calculation of damages). Because such evidence was relevant to the calculation of Finch's damages, the Court allowed Hercules to present a complete picture of the demographics of retirement patterns, using data directly involving Hercules employees, and contextualizing the retirement trends at Hercules with nationwide statistics. These statistics showed that 75% of Hercules employees retired by age 62, and that this correlated to similar trends on a national scale.

Consideration of Finch's work life expectancy folds into Finch's next ground for arguing that the statistical evidence on retirement was improperly admitted. Because Staller was only qualified as a damages expert, and not an expert on retirement trends, Finch argues that Staller's testimony should have been limited to the arithmetical calculation of damages. However, Hercules steadfastly contested the underlying assumption that Finch would have in fact retired at age 65 or 70. With this issue in dispute, Staller necessarily considered work life expectancy and based his expert opinion on damage figures accordingly. Pursuant to Fed.R.Evid. 703,[7] Staller was permitted to testify about the basis of his reaching his expert opinion so long as such evidence is the type of evidence

6. Prior to trial, the Court ruled *in limine* that both litigant's violated the Court's scheduling deadline for the filing of expert reports. Staller's expert report, because it was filed on the eve of trial, was ordered inadmissible. Finch was allowed to depose Staller during trial, which he did.

7. Rule 703 provides:

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.
Fed.R.Evid. 703.

reasonably relied upon by experts in his field. After Finch objected to Staller's lack of qualification in expertise on retirement trends, Hercules explained that the retirement trend testimony was presented merely to show the basis upon which Staller grounded his expert opinion. Finch acquiesced that this was an acceptable reason to admit the testimony, and that it was for the jury to accept or reject Staller's basis for his opinion. Tr. J–162.

Finally, Finch argues that normal retirement age is not properly the subject of expert testimony because it is not an issue requiring "technical or other specialized" knowledge within the meaning of Fed. R.Evid. 702. He cites *Gorniak v. National R.R. Passenger Corp.,* 889 F.2d 481 (3d Cir. 1989), for the proposition that "the factfinder may apply his or her own general sense about the ages at which persons commonly retire to the particular circumstances of the plaintiff before it." *Id.* at 489. In *Gorniak,* a railroad worker disabled from a work-related injury filed a negligence claim under the Federal Employer's Liability Act. *Id.* at 482. After the entry of a jury verdict for plaintiff, the parties differed over the reduction of plaintiff's award for lost earning capacity. At issue was the amount of years to be considered in reducing the award, *i.e.,* whether plaintiff would have continued to work until age 65. *Id.* at 485–86. At trial, plaintiff did not present evidence of what his intended retirement date would have been; apparently, the only relevant evidence was an actuarial estimate that he was expected to live until age 74. *Id.* at 486. With this dearth of evidence, the trial court assumed that plaintiff would have worked until age 65. The Third Circuit Court of Appeals affirmed this finding as reasonable, allowing for a common sense, lay approach to estimating retirement age.

In the instant case, the Court acknowledges that a lay juror could have a "general sense about the ages at which persons commonly retire." However, in applying this general sense to the particular circumstances of a case, a better informed lay juror is one who has his or her "general sense" augmented with facts and data, such as Finch's testimony of his intentions and Hercules' statistical evidence. Because Staller's scientific data assisted the jury in determining a fact in issue, it was properly the subject of expert testimony.

### 3. Jury Instructions

Finch next argues that he is entitled to a new trial on damages because the Court's instructions to the jury on damages were erroneous. The jury found Hercules liable for age discrimination against Finch, and awarded him only $200,000 in back pay damages. There was no award of front pay or liquidated damages. Finch argues that the award of $200,000 in damages falls far short of making him whole, and that there are only two possible reasons supporting an award in this amount.[8] During trial, Hercules followed two avenues of evidence and argument in its trying to convince the jury that Finch's damages should be less than what he claimed they should be. First, Hercules' damages expert Staller testified that there was a colorable inference that Finch's stated intention that he would retire at age 65 or 70 was not

8. Hercules points out the possibility that the jury's verdict may have been the result of compromise. D.I. 348 at 19, n. 7. The jury commenced deliberation Thursday afternoon, January 25, 1996, at 2:15 p.m., and continued deliberating throughout the next entire next day. At 2:45 p.m. January 26, the jury communicated the following:

> After much deliberation, the jury has not been able to reach a unanimous verdict. On the issue of 'preponderance of the evidence,' to prove something is more likely true than not true, we have been unable to work out our differences. It has become evident that we cannot reach a unanimous decision.

Tr. M–2. The Court reinstructed the jury on the issue of preponderance of the evidence, and the jury resumed deliberation until 4 p.m. At that time, still unable to reach a unanimous verdict, the jury was dismissed until 9 a.m. Monday morning, January 29.

On Monday, the jury deliberated until 11:23 a.m., at which time it rendered its verdict in favor of plaintiff for $200,000. Hercules may or may not be correct that this award may have been the product of compromise between jurors who believed in imposing liability and jurors who did not. At any rate, Hercules has not moved for a new trial based on this or any other theory. The Court will not consider this issue further.

credible. Second, utilizing evidence put on in plaintiff's case-in-chief, Hercules sought to demonstrate that Finch did not properly mitigate any damages he may have been entitled to. Finch argues that the Court's erroneously instructed the jury on both mitigation and age of retirement.

### a) Voluntary retirement date prior to trial

■ On the issue of damages, the Court instructed the jury as follows:

> In this case, Mr. Finch is seeking money damages. It is Mr. Finch's burden to prove by a preponderance of the evidence that he actually suffered damages and that such damages were directly caused by Hercules. *It is Mr. Finch's burden to prove by a preponderance of the evidence the extent of his damages and the date on which he would have retired from Hercules.*
>
> If you find for Mr. Finch, then you must award Mr. Finch such sum as you determine by a preponderance of the evidence will fairly and justly compensate him for any damage you find Mr. Finch sustained as a direct result of his termination. Mr. Finch's claim for damages includes two distinct types of damages, and you must consider each of them separately.
>
> First, you must determine the amount of any wages and benefits, including increased pension, bonuses, raises, stock, stock options, losses from the sale of Hercules stock etc., Mr. Finch would have earned in his employment with Hercules if he had not been discharged on February 4, 1991. These are the wages and benefits

Mr. Finch would have earned from February 4, 1991, through the date of trial. This is often called "back pay." However, if you conclude that Mr. Finch would have left his employment before this trial, for example, due to voluntary retirement, or otherwise,[9] you should take this point into account by reducing your back pay calculation. You should deduct from back pay the amount of any earnings and benefits that Mr. Finch received from other employment during that time period, as well as any severance pay Mr. Finch received from Hercules.

\* \* \*

> If you find that Mr. Finch would have retired from Hercules before this trial started, then you would not find him entitled to an award of front pay.

Tr. L–14–15, 17. At trial, Finch's counsel objected to the placing of the burden of proof regarding the time of retirement on Finch. *Id.* at L–92.

In his motion for new trial on the issue of damages, Finch again maintains that the instruction incorrectly saddled him with the burden of proof as to when Finch would have left the defendant's employment. He contends that the jury should have been instructed that if there was a finding of liability, Finch was presumptively entitled to back pay until the date judgment is entered in the case. D.I. 353 at 4. Accordingly, Finch argues, Hercules bore the burden of proving any setoffs to this amount. In addition, Finch asserts that because Hercules did not raise the issue of retirement age as an affirmative defense or in a motion *in limine,* the

---

9. In its answering brief, Hercules included one sentence speculating that the jury could have decided that Finch would ultimately have been lawfully terminated in subsequent downsizings. D.I. 348 at 19. Seizing upon this assertion, Finch, in his reply brief, engaged in a lengthy discussion that Hercules bore the burden of proving Finch would have been terminated in a later downsizing. D.I. 353 at 6–9.

Finch now argues that he has been prejudiced by the phrase "or otherwise" when the Court instructed the jury that it must reduce the back pay calculation if it concluded that Finch would have left his employment before the time of trial, due to voluntary retirement, or otherwise. However, examination of the trial record reveals that

on three occasions, Finch took the opportunity to object and present his underlying reasons for his objection to the burden of proof instruction. Tr. K–199–200, K–206, L–92. The Court understood Finch as objecting to his shouldering of the burden of proof of when he would have retired; Finch did not voice any objection to the phrase "or otherwise." Although Hercules has raised a post-trial argument that Finch would have been inevitably terminated in further reductions in staff, Hercules did not argue this to the jury, as Finch acknowledges. *See* D.I. 353 at 8, n. 11. Because Finch did not base any objection at trial on this language, and because Hercules did not advance this argument at trial, the Court will not consider this newly raised issue post-trial.

Court should have refrained from giving this instruction.

In the *ad damnum* clause of his complaint, Finch demanded judgment based on his "retirement at age sixty-five (65)." D.I. 1 at 6. At trial, Finch, now aged sixty-three, testified that he had not committed to a definite retirement date, that as he "went along," he would "see how [he] was able to go," and that working until age seventy was a "definite possibility." Tr. G–6. He also testified that he was financially motivated to work until age seventy because of various expenses, such as college tuition, mortgage payments, and a tithing obligation as a member of his church. Tr. F–113, 148–49, 178–80, 182. Finch also described how he enjoyed working and that his health was excellent. *Id.* at F–113. Finally, Finch testified that he had worked during the past year with a temporary job agency, doing mainly clerical work. Tr. F–97.

Finch put on expert testimony as to the amount of his damages. Dr. Andrisani, qualified as Finch's expert in calculating damages, testified that Finch's back pay damages were $888,830 as of December 31, 1995. Tr. E–180. Andrisani calculated Finch's front pay damages in the amount of $399,609 if he retired at age 65, and $1,334,395 if he retired at age 70. Tr. E–185. Andrisani's damage calculations included considerations of lost wages, bonuses, increased pension benefits, and stock losses. A written summary of Andrisani's calculations, broken down into sub-categories of back and front pay, was received into evidence. Exh. PX–23.

Hercules' expert Staller, as stated above, presented a range of lower damage figures that contemplated retirement at ages 60, 61, or 62, ages Finch attained prior to the time of trial. Tr. J–171–172. Because Hercules also advanced the argument that Finch did not properly mitigate his damages, some of Staller's damage estimates included consideration of Finch's finding new employment at annual salary levels of $25,000, $50,000, and $75,000. Depending on the assumptions made as to age of retirement, and the existence of mitigated employment, Staller's damage estimates ranged from $41,000 to $606,000. Tr. J–172. In his testimony of

Finch's possible retirement before the time of trial, however, Staller did not specifically emphasize this as an impact on back pay.

■■■ It is true that because the jury found Hercules liable under the ADEA, Finch is entitled to be made whole. *See Anastasio,* 838 F.2d at 708; *Conway v. Hercules, Inc.,* 831 F.Supp. 354, 357 n. 3 (D.Del. 1993). As a victim of age discrimination, Finch should be restored to the economic position he would have occupied but for the unlawful conduct of his employer. *Rodriguez v. Taylor,* 569 F.2d 1231, 1238 (3d Cir. 1977), *cert. denied,* 436 U.S. 913, 98 S.Ct. 2254, 56 L.Ed.2d 414 (1978). Similar to a Title VII discrimination case, where there is a finding of unlawful discrimination, back pay should be denied or reduced only for reasons which, if applied generally, would not frustrate the central statutory purposes of eradicating age discrimination throughout the economy and making the victim whole. *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 421, 95 S.Ct. 2362, 2373, 45 L.Ed.2d 280 (1975).

■■■ Back pay in an age discrimination case has been traditionally cast as the period beginning at the time of loss of employment resulting from the violation up until the time of trial. *Blum v. Witco Chem. Corp.,* 829 F.2d 367, 373 (3d Cir.1987); *Berndt v. Kaiser Aluminum & Chem. Sales, Inc.,* 604 F.Supp. 962, 964 (E.D.Pa.1985), *aff'd,* 789 F.2d 253 (3d Cir.1986). Front pay encompasses the period of future damages following trial; "[i]n calculating a front pay award, the jury must consider the expected future damages caused by defendant's wrongful conduct from the date of judgment to retirement." *Blum,* 829 F.2d at 374. However, neither the parties nor the Court has been able to locate precedent where the victim of discrimination would have possibly retired before the time of trial; there are cases, however, addressing the resolution of the proper length of a disputed front pay period. Although there is no authority directly addressing allocation of burdens of proof over the time period of a plaintiff's damages, certain cases are instructive when viewed in conjunction with the overall purposes underlying the ADEA.

Courts have struggled with the competing goals of "make whole relief" and the avoidance of windfall awards to victims of age discrimination. Finch concedes that it is "undeniable" that the plaintiff in an age discrimination case bears the burden of proving his damages by a preponderance of the evidence. D.I. 340 at 19; *see Gibson v. Mohawk Rubber Co.,* 695 F.2d 1093, 1100 n. 7 (8th Cir.1982); *Kolb v. Goldring, Inc.,* 694 F.2d 869, 873 (1st Cir.1982); *Conway v. Hercules,* 831 F.Supp. 354, 357–58 (D.Del.1993). Notwithstanding this burden on Finch, courts have frequently held the employer responsible for proving any setoffs to the victim's claimed damage figures. *See Blum,* 829 F.2d at 375; *Rodriguez,* 569 F.2d at 1243. Courts have identified such setoffs as including proof of income received from a subsequent employer, *id.;* pension benefits earned from a subsequent employer, *Blum,* 829 F.2d at 375; onset of disability preventing a plaintiff from working, *N.L.R.B. v. Louton,* 822 F.2d 412, 415 (3d Cir.1987); an unreasonably spurned offer of reinstatement, *Smith v. World Ins. Co.,* 38 F.3d 1456, 1465 (8th Cir.1994); and the inevitable termination of plaintiff absent discriminatory behavior, *Archambault v. United Computing Sys., Inc.,* 786 F.2d 1507, 1515 (11th Cir.1986). In the instant case, therefore, the issue distills down to the question of whether Finch was entitled to have the jury believe his assertion that he would not have retired until age 65 or at least until the time of trial. Stated differently, the narrow legal question is whether the date of projected retirement is necessarily a component of plaintiff's recovery of damages, which would be plaintiff's burden of proof, or is akin to a speculative setoff or limitation of damages, which would be defendant's burden of proof.

The fixing of that point in time when Finch would have retired absent his termination is unknowable because of the intervening discriminatory event. However, the ultimate decision of when to retire, or when to *intend* to retire was intensely personal and as such,

was Finch's and Finch's alone. Finch's evidence on this issue was comprised of subjective personal testimony and circumstantial evidence of his finances; it was for the jury to evaluate the credibility and reality of Finch's assertions. While the Court acknowledges that the risk of any speculation in the calculation of damages was upon Hercules, the employer, *see Bartek v. Urban Redevelopment Auth.,* 882 F.2d 739, 747 (3d Cir.1989), the Court also deems it unrealistic to expect the employer to carry the burden of proving what was peculiarly and exclusively within Finch's mind.

The issue of when Finch would have retired is not in the nature of a setoff to or limitation of his damages; it is of a different ilk from the setoffs subtracted from damages found in the authority assembled above. The assumption under these circumstances that back pay should be calculated from the date of termination automatically to the time of trial is overly simplistic; this is especially true where, as here, the Court is confronted with a plaintiff who, when the trial takes place, is within the range of what usually is considered normal retirement age. It was singularly within plaintiff's ability to set forth the evidence with respect to his personal mind set on retirement and to enable the jury to decide whether to award back and front pay. Consequently, I believe the burden was properly placed on plaintiff to identify the factual premise upon which his award of damages was to be based. *See Bartek,* 882 F.2d at 746–47. In short, realizing the question is close, the Court holds that it was not a miscarriage of justice to place the burden on Finch to prove to the jury when he would have retired; the jury instruction charging Finch with this burden was not erroneous.[10]

### b) Mitigation of Damages

■ Finch also argues that the Court should have ruled as a matter of law that he made a reasonable effort to mitigate his damages, and that the Court's jury instruction on

---

10. In its answering brief, Hercules included one sentence asserting that the jury could have decided that Finch would ultimately have been lawfully terminated in subsequent downsizings. D.I. 348 at 19. Seizing upon this assertion, Finch, in

his reply brief, engaged in a lengthy discussion that Hercules bore the burden of proving Finch would have been terminated in a later downsizing.

this issue was unwarranted by the evidence. Finch does not argue that the Court gave an incorrect statement of the law of mitigation.

Finch argues that he offered evidence of hundreds of substantially equivalent positions for which he applied, and that this evidence is "undisputed." D.I. 340 at 27. Hercules, however, does not agree that the positions Finch sought following termination were "substantially equivalent." After reviewing Finch's lack of status as a Certified Public Accountant ("CPA") or a Certified Internal Auditor ("CIA"), and his lack of a graduate degree in Business Administration ("MBA"), Hercules cross-examined Finch about application for employment after his severance from Hercules. Tr. F–134, F–175–77. Finch testified that he sent out 283 resumes, many for positions labeled Director of Audit by prospective employers. Tr. F–94. Finch recorded his sending of these resumes in a log containing dates, name of prospective employer, and position applied for; this log was admitted into evidence. PX 18. Finch's resume mailing campaign yielded only three interviews, which he attended. Tr. F–95. Finch delineated the extent of his limited success in securing employment in his case-in-chief. F–96–97. In its case-in-chief, Hercules did not present any of its own evidence on the mitigation issue; it chose to stand on the mitigation evidence put on by plaintiff as well as testimony extracted during cross-examination. Hercules elicited from Finch that many of the jobs he applied for preferred or even required that the applicant be certified as a CPA or have earned a Masters Degree in Business Administration, qualifications not possessed by Finch. Tr. F–176.

█ Under the ADEA, the employer shoulders the burden of proving that the plaintiff failed to mitigate his damages. *Anastasio*, 838 F.2d at 707. In order to present the issue of mitigation to the jury, Hercules needed to show: (1) substantially equivalent positions were available to Finch and (2) he failed to use reasonable diligence in attempting to secure such employment. *Id.* at 708; *Booker v. Taylor Milk Co., Inc.*, 64 F.3d 860, 864 (3d Cir.1995).

█ Generally, a plaintiff may satisfy the reasonable diligence requirement by demon-strating his commitment to seeking active employment and by remaining ready, willing, and able to work. *Booker*, 64 F.3d at 865. However, a plaintiff's duty to mitigate his damages is not met by using reasonable diligence to obtain *any* employment; the employment must be substantially equivalent employment. *Id.* at 866. Substantially equivalent employment has been defined as "that employment which affords virtually identical promotional opportunities, compensation, job responsibilities, and status as the position from the position from which the ... claimant has been discriminatorily terminated." *Id.*

In this case, Finch asserts he "offered evidence of hundreds of substantially equivalent positions for which he applied." D.I. 340 at 27. Hercules correctly argues that it is entitled to rely on the proffered evidence of substantially equivalent positions put on by plaintiff, Tr. K–211; D.I. 348 at 35, and that this was sufficient evidence to meet its burden of proving this issue. Remaining, therefore, is the second prong of Hercules's burden of proof: whether there was enough evidence to submit to the jury the issue of whether Finch's efforts in seeking employment were reasonably diligent, *i.e.*, whether he demonstrated a continuing commitment to being a member of the work force and his status of being ready, willing, and able to work.

█ The evidence showed that Finch's efforts to mitigate were largely spent in mailing out resumes at a rate that averaged about one per week. Whether or not a claimant has met his duty to mitigate damages is a determination of fact normally reserved for the jury, *Booker*, 64 F.3d at 864, and the Court is not prepared to rule as a matter of law that Finch should or should not have done more to meet his duty of reasonable diligence. Consequently, the Court reaffirms its decision to submit this issue to the jury and charge accordingly.

### C. Plaintiff's Motion for Attorneys' Fees and Costs

#### 1. Standard for Awarding Attorneys' Fees

█ Under the ADEA, Finch, as the prevailing party, is entitled to recover reason-

able attorneys' fees and costs in connection with prosecuting his meritorious claim. 29 U.S.C. § 626(b), incorporating 29 U.S.C. § 216(b); *see also Sullivan v. Crown Paper Bd. Co.,* 719 F.2d 667, 669 n. 1 (3d Cir.1983). A reasonable attorney's fee is one that is adequate to attract competent counsel, but at the same time, does not produce a windfall to that attorney. *Blum v. Stenson,* 465 U.S. 886, 897, 104 S.Ct. 1541, 1548, 79 L.Ed.2d 891 (1984). Finch has submitted documentation of billable hours generated by both paralegals and attorneys over the past four and one-half years. He requests a total of $1,107,386.67 in fees and $80,642.23 in costs, D.I. 357, both of which dwarf the $200,000 judgment awarded him by the jury. In keeping with the tradition of a vigorous and ofttimes venomous response that has become the dubious hallmark claimed by both sides in this litigation, Hercules set forth numerous and extensive arguments to reduce the amount to be awarded to $258,271.57.[11] D.I. 342 at 35.

The amount of attorneys' fees awarded in cases under the ADEA is committed to the sound discretion of the district court. *Hensley v. Eckerhart,* 461 U.S. 424, 437, 103 S.Ct. 1933, 1941, 76 L.Ed.2d 40 (1983).[12] In determining a fee award, "[t]he most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Washington v. Philadelphia County Court of Common Pleas,* 89 F.3d 1031, 1035 (3d Cir. 1996) (quoting *Hensley,* 461 U.S. at 433, 103 S.Ct. at 1939). This calculation is called the "lodestar," and is strongly presumed to compute a reasonable fee. *Washington,* 89 F.3d at 1035. However, the lodestar figure is also subject to downward or upward adjustments, depending on a variety of factors. The United States Supreme Court has outlined the following as relevant to a court's consideration in determining fees:

(1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*Hensley,* 461 U.S. at 430 n. 3, 103 S.Ct. at 1937 n. 3 (citing, *inter alia,* American Bar Association Code of Professional Responsibility, Disciplinary Rule 2–106). Notwithstanding this multiplicity of considerations, the Supreme Court has also admonished that a fee petition should not mushroom into second major litigation with a life of its own. *Hensley,* 461 U.S. at 437, 103 S.Ct. at 1941. As a corollary, it is also significant to note that the Court should not "become enmeshed in a meticulous analysis of every detailed facet of the professional representation." *Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.,* 540 F.2d 102, 116 (3d Cir.1976) (in banc). With these precepts in mind, the Court now turns to the operose

---

11. As its lead-off argument, Hercules asserted that Finch's fee petition was premature. Pursuant to Fed.R.Civ.P. 54(b), Finch correctly filed his fee petition no later than 14 days after entry of judgment in this action. While acknowledging that Finch was a "potentially" prevailing party, Hercules argued that because the motions for judgment as a matter of law and for a new trial on the issue of damages were yet to be resolved, these matters could have affected Finch's entitlement to enforce the $200,000 judgment entered in his favor. However, because the opinion and order entered today disposes of all pending matters, Finch clearly retains his status as prevailing party in this action. Treatment of Finch's motion for fees and costs is therefore appropriate.

12. Although the *Hensley* Court was confronted with construction of 42 U.S.C. § 1988, the Civil Rights Attorney Fee Awards Act, rather than the Age Discrimination in Employment Act or the Fair Labor Standards Act, the standards established under *Hensley* "are generally applicable in all cases in which Congress has authorized an award of fees to a 'prevailing party.'" *Hensley,* 461 U.S. at 433 n. 7, 103 S.Ct. at 1939 n. 7. Federal courts regularly treat "the various fee-shifting antidiscrimination statutes as governed by the same standards." *Sullivan,* 719 F.2d at 669 n. 1; *see also Bell v. United Princeton Properties,* 884 F.2d 713, 719 (3d Cir.1989) (there is "no reason to create a different jurisprudence of fee awards" for different fee shifting statutes).

task of unraveling the disputed issues presented by the petition for fees and costs.

### a) Defining the Lodestar: Were Counsel's Billed Hours Reasonably Expended or Excessive?

As a threshold matter, Finch, the party seeking attorneys' fees, must prove that his request is reasonable by submitting documentation supporting the hours worked and the rates claimed. *Rode v. Dellarciprete*, 892 F.2d 1177, 1183 (3d Cir.1990). Hercules, as the party opposing the fee award, then has the burden to challenge, by affidavit or sufficiently specific brief, the reasonableness of the requested fee. *Id.* Hercules does not challenge the present hourly rates as claimed by the various attorneys involved in plaintiff's case. D.I. 342 at 23. Hercules does contend, however, that the lodestar suggested by plaintiff is too high because it incorporates many hours that were not reasonably expended. *Id.* While it objects to the amount of hours declared by Finch's counsel, Hercules need not point to each individual excessive entry; instead, it "need only specify with particularity the reason for its challenge and the category (or categories) of work being challenged." *Bell*, 884 F.2d at 721.

Where a counsel for a prevailing civil rights party seeks an award of attorneys fees, the Supreme Court has exhorted counsel to exercise "billing judgment" in their request for fees. *Hensley*, 461 U.S. at 434, 103 S.Ct. at 1939–40. Stated differently, counsel are expected to make a good-faith effort to exclude hours that are excessive, redundant, or otherwise unnecessary. *Id.* "Hours that are not properly billed to one's *client* are also not properly billed to one's *adversary* pursuant to statutory authority." *Id.* If counsel does not exercise billing judgment, the district court should exclude such hours from the lodestar calculation. *Rode*, 892 F.2d at 1183.

Arguing that opposing counsel's fee petition prays for remuneration for excessive hours, Hercules maintains that the lodestar should be diminished from plaintiff's initially proffered figure of $909,260.75 to $782,641.15, a reduction of $126,619.60. Several bases lie at the heart of Hercules' contention: (1) Finch asserted multiple non-meritorious claims, motions, and discovery demands, forcing Hercules to respond to motions that should have never been brought; (2) Finch made settlement demands that were excessive in light of the jury's award of $200,000; (3) Finch refused to respond to Hercules' attempt to open realistic discussions about settlement; (4) Hours spent on cases and communications with other counsel involving other plaintiffs with claims against Hercules were unnecessary and irrelevant, and (5) Counsel "overstaffed" the trial with the daily attendance of three attorneys plus a paralegal.

The United States Supreme Court in *Hensley* explained the basis for excluding time devoted to certain types of unsuccessful claims:

> In some cases a plaintiff may present in one lawsuit distinct claims for relief that are based on different facts and legal theories. In such a suit, even where the claims are brought against the same defendants ... counsel's work on one claim will be unrelated to his work on another claim. Accordingly, work on the unsuccessful claim cannot be deemed to have been "expended in pursuit of the ultimate result achieved." ... The congressional intent to limit awards to prevailing parties requires that these unrelated claims be treated as though they had been raised in separate lawsuits, and therefore no fee may be awarded for services on the unsuccessful claim.

*Hensley*, 461 U.S. at 434–35, 103 S.Ct. at 1939–40. Hercules is therefore correct in its assertion that the Court must exclude from the final award the amount of time spent by plaintiff's counsel on unsuccessful, unrelated claims.

At the inception of this action, Finch filed a two-count complaint alleging violation of both the ADEA, as well as a "vaguely asserted state law pendent count" of wrongful discharge. *Finch v. Hercules*, 809 F.Supp. 309, 310 (D.Del.1993). Hercules immediately moved for judgment on the pleadings as to the state law count, which the Court granted. *Id.* In dismissing plaintiff's

state law claim, the Court rejected plaintiff's invocation of any common law policy public policy exception to Delaware's statutory scheme of employment at-will doctrine. *Id.* at 312. The Court also found no authority under Delaware law for allowing a cause of action for malicious discharge. *Id.* at 313.

■ Hercules urges this Court to disallow $4,331.50 billed by Finch's counsel for litigating the state law claim and asserts that it was not necessary for Finch to succeed on the state law claim in order to succeed on the merits of the ADEA claim. It is well settled that "the court can reduce the hours claimed by the number of hours 'spent litigating claims on which the party did not succeed and that were distinct in all respects from claims on which the party did succeed.'" *Washington,* 89 F.3d at 1044 (citations omitted). Hercules directs the Court to *Blum v. Witco Chem. Corp.,* 829 F.2d 367 (3d Cir. 1987). In that case, the Third Circuit Court of Appeals approved the exclusion from the lodestar calculation hours spent on an unsuccessful state law wrongful discharge claim in an action brought primarily under the ADEA.

Finch counters that "pulling out the time spent solely on arguments developed for the wrongful discharge claim ... would be a futile exercise" because the unsuccessful state law claim was substantially intertwined with the ADEA claim. D.I. 345 at 10. However, in reviewing counsel's time sheets, many entries clearly reflect discrete devotion of billable hours to the state law claim. D.I. 320, Exh. 3 at 12–13. Accordingly, the Court will subtract these hours from the lodestar calculation. The Court, however, disagrees with the figure of $4,331.50 suggested by Hercules and finds the billed amount attrib-

utable to the unsuccessful state law claim to be $3,564.00.

■ Hercules also argues that time spent on other unsuccessful "claims" must be discounted as well. After this action was well under way, Finch amended his ADEA disparate treatment theory by adding additional allegations supporting a disparate impact theory as well. When Hercules filed its motion for summary judgment, the Court ruled on both ADEA theories and granted partial summary judgment in Hercules' favor as to the disparate impact theory. *Finch v. Hercules,* 865 F.Supp. 1104 (D.Del.1994).

Finch filed an interlocutory appeal on this issue, which, at the time, was one of first impression in this circuit. D.I. 196. The Third Circuit Court of Appeals dismissed the appeal for want of jurisdiction, citing as authority *Gerardi v. Pelullo,* 16 F.3d 1363, 1368–72 (3d Cir.1994). In the *Gerardi* opinion, the court held that under the finality requirement of Fed.R.Civ.P. 54(b),[13] the judgment in question must represent the ultimate disposition of an individual claim for relief, and that claim must be separable from the other claims remaining for adjudication. *Id.* at 1369. Finch argues that by citing this authority when it dismissed the interlocutory appeal, the appellate court in essence determined that Finch's disparate impact claim was not an individual claim for relief. Viewed in front of this backdrop, the Court agrees that Finch's pursuit under a disparate impact theory was part of his single claim for a violation of the ADEA and "involve[s] a common core of facts or [is] ... based on [a] related legal theor[y]." *Hensley,* 461 U.S. at 435, 103 S.Ct. at 1940. The Court will therefore decline to reduce the lodestar for hours spent on the disparate impact claim.

---

13. The rule provides:
(b) Judgment upon multiple claims or involving multiple parties. When more than one claim for relief is presented in an action, whether as a claim, counterclaim, or third-party claim, or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment. In the absence of such

determination and direction, any order or other form of decision, however designated, which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties, and the order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties.
Fed.R.Civ.P. 54(b).

■ ·Hercules · also seeks to disallow hours billed by counsel for time spent on pursuing a "mixed-motive" theory under the ADEA. Mixed-motive, however, is not a separate claim, rather, it is more akin to a method of proof devised to analyze evidence in a disparate treatment case. Accordingly, these hours will be counted toward the lodestar calculation.

Hercules also asserts that Finch approached this litigation by consistently over-litigating motions that should have never been brought. D.I. 342 at 21. With unintended irony, Hercules attempts to belittle with graphic detail the history and spurious results of various motions "over-litigated" by its opponent during the four years leading up to trial. True to form, Finch responded in kind in his reply brief.

The Court has carefully considered Hercules' charge of excessively billed hours in this regard and has reviewed the record in depth. While agreeing wholeheartedly that this case has been aggressively litigated, the Court would stop short of characterizing this case as "over-litigated." Simply put, each side has incessantly defended its position in earnest, digging in where perhaps counsel of fainter (and perhaps wiser) disposition would have given in. Counsel have not pursued legal theories that were nakedly frivolous or claims that were not at least somewhat arguable.

■ Hercules did raise one instance where the Court agrees that the hours billed are excessive: Finch's motion for reargument of the Court's decision on summary judgment. *Id.* at 12. The Court recalls this motion as not setting forth any colorable grounds for reargument based on either fact or law; disposition of the motion warranted only a mere order of denial without explanation. D.I. 192. Although Finch has billed 52.7 hours for a total of $11,473.80 for filing this motion, in light of the Court's in depth treatment of its summary judgment decision, the Court deems these hours billed as excessive and unnecessary. Therefore, this sum

will not be figured into the lodestar calculation.

■ In that same vein, in supplemental briefing, Hercules points to the amount billed by counsel for time expended on the post-trial motions in this case. Finch has tendered a bill for $125,145.50 for the briefing and arguing of these motions over the time period February, 1996 through July, 1996. While acknowledging counsels' need to address the post-trial issues zealously on behalf of their client, the Court is shocked by this wanton expenditure of resources. Accordingly, in its discretion, the Court will reduce these hours by 50% and will allow a calculation of $62,572.75 to be used · instead for purposes of defining the lodestar.

The other bases advanced by Hercules for reduction of hours merit little discussion. The Court is unpersuaded that settlement negotiations, or the lack thereof attributable to both sides, should bear on the consideration of excessiveness of hours billed. Each party has lobbed many salvos at its opponent, each berating the other side for "intransigent" settlement behavior both pre-trial and post-trial; the Court views the parties' posturing as effectively canceling each other out for purposes of considering excessiveness of billed hours.

■ The Court is similarly not convinced by Hercules' argument that Finch "overstaffed" the trial by having three attorneys and a paralegal in daily attendance. Although Hercules saw fit to staff this trial with two attorneys of record, Hercules also ensured that the trial be co-piloted by in-house counsel, Brent Zepke, Esq., albeit under the guise of corporate party-designee. While cognizant of Hercules' right to attend trial through its representative, the Court also was impressed with Zepke's active role as an attorney in this proceeding.[14] Both pre-trial and during trial, Zepke was allowed to advocate on the record on Hercules' behalf. *See, e.g.,* Tr. K–211 (prayer conference). It is not unreasonable that the number of attorneys used by the defendant at

14. Zepke also quite actively participated as advocate, again, under the aegis of corporate representative, in another ADEA trial in this court,

*O'Neill v. Hercules,* CA 93–28 MMS (January 1995).

trial should serve as a gauge of the appropriateness of the plaintiff's use of multiple attorneys. *See e.g., Coalition to Save Our Children v. State Bd. of Educ.,* 143 F.R.D. 61, 64 (D.Del.1992) ("what is sauce for the goose is sauce for the gander"). In addition, given the complexity and length of this trial, the Court will also not begrudge counsel's decision to have a paralegal at hand in the courtroom.

Moreover, counsel for Finch provided evidence declaring that for health reasons, one of plaintiff's attorneys had involuntarily curtailed participation in this action. This reduction necessitated the augmentation of participation by other counsel, whose attendance at trial was justified. After pondering these considerations, the Court concludes that counsel for plaintiff did not "overstaff" Finch's trial.

▆▆▆ Finally, Hercules argues that Finch billed for numerous entries regarding his involvement with counsel for other plaintiffs who had filed similar ADEA claims against Hercules. Hercules questions the relevancy and necessity of these endeavors. Finch, however, has explained to the Court's satisfaction that these efforts were targeted towards avoiding the expense of taking duplicative deposition testimony of William Hosker, who eventually testified at trial. These hours will therefore be included in the lodestar.

In calculating the lodestar, the Court therefore starts with Finch's proffered figure of $1,034,406.25, which is based on his initial lodestar figure of $909,260.75 plus the supplemental figure of $125,145.50. D.I. 357. After reducing this figure by $11,473.80 for the hours discounted for time spent on the motion for reargument of summary judgment, $62,572.75 for excessive hours spent on post-trial briefing, and $3,564.00 for hours spent on the unsuccessful state law claim, the Court finds the loadstar in this case to be $956,795.70.

### b) Adjustments to the Lodestar

#### i. Downward Adjustment for only Partial Success

▆▆▆ Once the lodestar has been established, the Court has additional discretion to make certain adjustments either upward or downward. The party seeking adjustment has the burden of proving that the adjustment is necessary. *Rode,* 892 F.2d at 1183.

▆▆▆ Hercules argues that the Court should adjust the lodestar downward to reflect Finch's limited success with respect to the results obtained in this case. D.I. 342 at 28. As the Supreme Court has explained,

> If … a plaintiff has achieved only partial or limited success, the product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate may be an excessive amount. This will be true even where the plaintiff's claims were interrelated, non-frivolous, and raised in good faith. Congress has not authorized an award of fees whenever it was reasonable for a plaintiff to bring a lawsuit or whenever conscientious counsel tried the case with devotion and skill. Again, the most critical factor is the degree of success obtained.

*Hensley,* 461 U.S. at 436, 103 S.Ct. at 1941. The Third Circuit Court of Appeals has elaborated that the lodestar should be adjusted downward if it is not

> reasonable in light of the results obtained. This general reduction accounts for time spent litigating wholly or partially unsuccessful claims that are related to the litigation of the successful claims. This adjustment should be taken independently of the other adjustments and should be the first adjustment applied to the lodestar.

*Rode,* 892 F.2d at 1183 (citations omitted). The Court is therefore charged with focusing on the significance of the overall relief obtained; if a plaintiff has achieved "excellent results," counsel should recover a fully compensatory fee. *Hensley,* 461 U.S. at 435, 103 S.Ct. at 1940. In evaluating the results obtained by a prevailing party and fixing a lodestar adjustment, the Court may not diminish counsel fees by merely quantifying a proportionate ratio based on the amount of damages a plaintiff recovers. *Washington,* 89 F.3d at 1040–42 (citing *City of Riverside v. Rivera,* 477 U.S. 561, 106 S.Ct. 2686, 91 L.Ed.2d 466 (1986)). Rather, the Court is encouraged to consider the amount of dam-

ages *awarded* with the amount of damages *requested,* qualitatively evaluating the relief in comparison to the litigation as a whole. *Hensley,* 461 U.S. at 440, 103 S.Ct. at 1943; *Washington,* 89 F.3d at 1043.

Hercules argues, convincingly, that plaintiff did not achieve "excellent results" in this case. In seeking compensation for his injury, Finch tendered evidence that his wages, raises, bonuses, pension monies, and stock losses would have totaled an amount upwards of $2.2 million but for Hercules' discrimination. PX 23. In addition, Finch sought to prove that Hercules' discrimination was willful, thus entitling Finch to a doubling of the above damages pursuant to the ADEA's liquidated damage provision. Finch failed to persuade the jury that Hercules willfully discriminated against him; he also failed in his efforts to prevail on the issues of front pay and stock losses. D.I. 295. In addition, the jury failed to award Finch the amount of back pay he assumed he was entitled to. Dissatisfied with the quantity and quality of the jury verdict, the plaintiff has filed a motion for a new trial on the issue of damages, an expression of the non-excellence of his result. Because the jury did not find the bulk of Finch's case as meriting an award even remotely approaching his requested amount of damages, the Court finds that Finch can hardly be deemed to have achieved "excellent results."

■ In recommending a negative multiplier to be applied to the lodestar, Hercules engaged in a somewhat simplistic approach. Hercules recommended the Court award a fee that was 33% of the lodestar, 33% being a figure Hercules deemed consistent with amounts generally charged by plaintiff's attorneys who accept cases on a contingency basis. Hercules justified the 67% reduction of the lodestar by blaming Finch for incurring such extremely large fees in the first place. D.I. 342 at 35. This, Hercules argued, is quite generous in light of the $200,-000 jury award, purportedly only 5% of the award Finch sought.

The Court agrees, for the reasons outlined above, that Finch did not obtain excellent results in this case, and that a lodestar reduction is warranted. This is not an easy

task, for there is no precise rule or formula readily available. *Hensley,* 461 U.S. at 436, 103 S.Ct. at 1941. Unlike Hercules, the Court does not hold Finch solely responsible for the magnitude of the fees in this case; many of those fees were generated in response to Hercules' actions. The Court finds that the 67% reduction requested by Hercules to be extreme, in light of all of the above considerations of the quality of plaintiff's success. Accordingly, the Court, in its discretion, will apply a 35% reduction to the lodestar to reflect the partial success of the prevailing plaintiff. This calculation reduces the fee award to $621,917.21.

### ii. Upward Adjustment as a Delay Enhancer

■ Finch seeks an upward adjustment to the lodestar to compensate counsel for the delay in payment for the time gap between the time services were rendered and the fee award, known as a "delay enhancement." *See Pennsylvania v. Delaware Valley Citizens Council for Clean Air,* 483 U.S. 711, 716, 107 S.Ct. 3078, 3081–82, 97 L.Ed.2d 585 (1987); *Student Public Interest Research Grp. v. AT & T Bell Labs.,* 842 F.2d 1436, 1453 (3d Cir.1988). This enhancement is available regardless of whether plaintiff achieved partial or full success. *Institutionalized Juveniles v. Secretary of Pub. Welfare,* 758 F.2d 897, 923 (3d Cir.1985). Such an enhancement serves to place counsel, who have accepted Finch's case on a contingency basis, on par with attorneys who are paid before and during the course of representation. *Blum v. Witco Chem. Co.,* 888 F.2d 975, 984 (3d Cir.1989). As the one seeking the enhancement, Finch bears the burden of documenting the need for such a multiplier. *Keenan v. City of Philadelphia,* 983 F.2d 459, 476 (3d Cir.1992).

■ Under the precedent in this circuit, a party applying for a delay enhancer should document evidence of the time value of money and market interest rates over the period in question. *Blum,* 888 F.2d at 984; *Institutionalized Juveniles,* 758 F.2d at 923. Although Hercules argues that the law requires Finch to demonstrate that he suffered financial detriment, the Court has not found any

authority requiring such a showing. Finch has supplied to the Court a calculation of an enhancement of the fees billed based on historical market rates: the prime rate of interest, using an average quarterly rate calculated on a quarterly basis. D.I. 312. The relevant dates factored into the calculation are the filing date of this action through September 30, 1995; based on these assumptions, the calculated amount for delay enhancement is $72,980.42. This enhancement, when added to the fees calculated thus far, render a total fee award to plaintiff in the amount of $694,897.63.

### 2. Costs

Plaintiff has also petitioned for reimbursement of his costs in this action. The taxation of costs to a losing party is authorized under the ADEA and implemented by 28 U.S.C. § 1920 and Fed.R.Civ.P. 54(d)(1). Finch has supplied the Court with a listing of categories of expenses and a corresponding dollar figure for each category. Hercules argues that documentation in such summary form is entirely inadequate to support an award of costs. However, Finch has stated that he merely asserted his right to costs to put the Court and Hercules on notice. Under District of Delaware Local Rule of Civil Procedure 54.1(a), the bill of costs is to be filed within 10 days after the time for appeal has expired or within 10 days of the issuance of the mandate of the appellate court. Hercules' objection to costs is thus premature. The Court will address specific issues and disputes, if any, arising from plaintiff's bill of costs when plaintiff submits his costs.

### IV. CONCLUSION

For the above mentioned reasons, the Court will deny defendant's motion for judgment as a matter of law, and deny plaintiff's motion for new trial on the issue of damages. Plaintiff's motion for attorneys' fees and costs will be granted in part. An appropriate order will be entered.